LAW OFFICES OF SIMON HARTER, ESQ.
Simon Harter, Esq. (SH-8540)
225 West 34th Street – 9th Floor
New York, New York 10122
Tel:  (212) 979-0250
Fax: (212) 979-0251
Email: sharter@harterlaw.com
Attorneys for Plaintiff, Theobroma B.V.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------------x
THEOBROMA BV,                           :        CIVIL ACTION NO:
                                        :
                    Plaintiff.          :
                                        :
-against-                               :
                                        :
FEDERAL INSURANCE COMPANY,              :
THE CONTINENTAL INSURANCE              :
COMPANY, AGCS MARINE INSURANCE         :
COMPANY, XL CATLIN SPECIALTY           :
INSURANCE COMPANY, ENDURANCE           :
AMERICAN INSURANCE COMPANY,            :
AXA CORPORATE SOLUTIONS                :
ASSURANCE, ALLIANZ BENELUX SA,         :
ALLIANZ VERSICHERUNGS AG, and          :
AIG EUROPE LIMITED,                     :
                                        :
                    Defendants.         :
-----------------------------------------------------------------x
```

## VERIFIED COMPLAINT

Plaintiff, Theobroma BV ("Plaintiff"), by and through undersigned counsel,

as and for its Verified Complaint against Defendants, Federal Insurance Company, The

Continental Insurance Company, AGCS Marine Insurance Company, XL Catlin Specialty

Insurance Company (f/k/a and/or d/b/a XL Specialty Insurance Company), Endurance

American Insurance Company, AXA Corporate Solutions Assurance, Allianz Benelux

SA, Allianz Versicherungs AG, and AIG Europe Limited (collectively "Defendants"), does hereby allege as follows:

## NATURE OF THE ACTION

1.    By this action, Plaintiff brings this action against Defendants for breaches of a maritime contract of marine insurance entitled "2016 MARINE OPEN COMMODITY POLICY," bearing Policy No. LRK #125/16G125/69875/OC1972/OC91610200/ UM00025669MA16A/ OMC10005204902,[1] and covering Plaintiff, on an all-risks basis, for insured losses during the period from July 1, 2016 through July 1, 2017 ("Policy").

2.    Defendants are collectively the insurers of the Policy.  Each Defendant is responsible for performance of the Policy, to the extent of its subscribing percentage of the total coverage provided under the Policy.

3.    As explained in detail below, Plaintiff's claims arise out of the loss of seventeen shipments of cocoa powder and cocoa butter to the United States at various times in 2016.

## JURISDICTION AND VENUE

4.    The action concerns questions of coverage under a policy of marine insurance and therefore comes within the admiralty and maritime jurisdiction of this Court pursuant to 28 U.S.C. § 1333 and within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

---

[1] © Rekerdres & Sons Insurance Agency, Inc, 2016.  Plaintiff intends to file a motion for a protective order to facilitate the submission of the Policy into the record.  The basis for the motion is that the Policy is confidential, constitutes a trade secret, and contains commercial information warranting protection against release.

5.      Venue lies in this District pursuant to 28 U.S.C. §1390(b) and Rule 82 of the Federal Rules of Civil Procedure.

6.      Defendants are subject to the personal jurisdiction of this Court on the basis of the following provision in Clause 49 of the Policy:

> … Any dispute that cannot be mediated or resolved by non-judicial measures may be brought only in the federal or state courts of competent jurisdiction in New York County, New York. Underwriters agree to comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practices of such court, and that in any suit instituted against any one of them upon this Policy we [sic] will abide by the final decision of such court or of any appellate court in the event of an appeal.

## THE PARTIES

7.      Plaintiff, Theobroma BV, is a limited liability company formed under the laws of the Netherlands and with a principal place of business in Amsterdam, Netherlands.  Plaintiff is a leading international trader and market maker in cocoa products and processes cocoa beans.

8.      Defendant, Federal Insurance Company, was and is an Indiana corporation with a principal place of business in Warren, New Jersey.

9.      Defendant, The Continental Insurance Company, was and is a New York Indiana corporation with a principal place of business in the City of New York.

10.     Defendant, AGCS Marine Insurance Company, was and is an Illinois corporation with a principal place in the State of Illinois.

11.     Defendant, XL Catlin Specialty Insurance Company (f/k/a and/or d/b/a XL Specialty Insurance Company), was and is a Delaware corporation with a principal place of business in the State of Connecticut.

12.     Defendant, Endurance American Insurance Company, was and is a Delaware corporation with a principal place of business in Purchase, New York.

13.     Defendant, AXA Corporate Solutions Assurance, was and is a French corporation with a principal place of business in Paris, France, and which subscribed to Policy both directly and through Jean Verheyen, a third-party underwriting agency acting on its behalf.

14.     Defendant, Allianz Benelux SA, was and is a Belgian corporation with a principal place of business in Brussels, Belgium.

15.     Defendant, Allianz Versicherungs AG, was and is a German corporation with a principal place of business in Munich, Germany, and which subscribed to the Policy through Jean Verheyen, a third-party underwriting agency acting on its behalf.

16.     Defendant, AIG Europe Limited, was and is a United Kingdom corporation with a principal place of business in London, England.

## FACTS OF COVERED LOSS

17.     Plaintiff incorporates the facts and allegations contained in the foregoing paragraphs as though fully set forth herein.

18.     On or about August 30, 2016 Plaintiff entered into contracts with Amerra Capital Management LLC ("Amerra") for the purchase of 1,040,000 kgs of cocoa butter

and 1,086,336 kgs of cocoa powder respectively ("the Goods"), which were specified to be "Afloat/Instore."

19.     Both purchase contracts incorporate standard industry trading terms promulgated by the Federation of Cocoa Commerce which provide for the application of English law and London arbitration to the contracts.

20.     Title to the Goods was to be conveyed to Plaintiff in the form of seventeen fully endorsed and negotiable bills of lading.[2]

21.     Upon payment by Plaintiff of the amounts due to Amerra, Plaintiff received the seventeen bills of lading, which bore numbers S00031053, S00031054, S00031064, S00031423, S00031469, S00031470, S00031516, S00031547, S00031573, S00031710, S00031711, S00031756, S00031757, S00031878, S00031366, S00031426 and S00031693.

22.     The bills of lading identified STS Care Ltd. ("STS Care") as the carrier. STS Care is a limited liability company registered under the laws of Hong Kong and with a principal place of business in Hong Kong.  STS Care is a non-vessel owning common carrier registered with the Federal Maritime Commission.

23.     The bills of lading identified Swiss Trading Solutions Ltd. ("STS Ltd.") as the party to whom application was to be made for release of the Goods.  STS Ltd. is a limited partnership organization registered under the laws of Switzerland and with a principal place of business in Reinach, Switzerland. Swiss Trading Solutions is a freight forwarder, logistics consultant, and commodities trade financier. STS Care and STS Ltd. are related companies.

---

[2]  Goods insured under the Policy are referred to in the Policy as "Cover Interest."

24. The bills of lading each provide for the application of Swiss law and for the exclusive jurisdiction of the courts of Basel, Switzerland.

25. The cocoa powder and cocoa butter Plaintiff purchased from Amerra included quantities of cocoa powder and cocoa butter that Plaintiff ultimately agreed to resell to Transmar Commodity Group Ltd. ("Transmar") of Morristown, New Jersey.

26. At the time Plaintiff purchased the Goods from Amerra, Plaintiff understood that for each of the shipments represented by the bills of lading, the portion of the Goods covered by the particular bill of lading had either been, or was to be, discharged at the Port of New York/New Jersey for delivery to Swedesboro, Edison, or South Plainfield, New Jersey, and at the Port of Oakland, California for delivery in Oakland, and that the Goods were under the care and control of STS Ltd. under the terms of the bills of lading.

27. On September 8, 2016, Peter B. Johnson, of the Transmar Group and Euromar, sent an email to Pasquale Genier of STS Ltd. requesting that STS Ltd. confirm to Plaintiff that the Goods were held by STS Ltd. in bond and that the Goods would be released to Plaintiff upon receipt of one of the three originals of each of the seventeen bills of lading, as required by terms stated on the front side of the bills of lading.

28. On that same date, STS Ltd. confirmed to Mr. Johnson, and Plaintiff reading in copy, that it was holding the Goods. STS Ltd. also confirmed that it would release the Goods upon Plaintiff's presentation of one of the three originals of each of the seventeen bills of lading.

29.     Thereafter, on September 9, 2016, STS Ltd. advised Plaintiff that the Goods were being stored at four warehouses.  Two of the warehouses named by STS Ltd. are located in South Plainfield and Edison, New Jersey respectively and are operated by Hall's Warehouse Corporation. The third named warehouse is located in Swedesboro, New Jersey and is operated by Cocoa Services LLC which, at that time, was a wholly-owned subsidiary of Transmar. The fourth named warehouse is located in Union City, California and is operated by Cocoa Services West, LLC which, at that time, was also a wholly-owned subsidiary of Transmar.

30.     Based upon these assurances, and upon receipt of full sets of shipping documents, including open endorsed and negotiable bills of lading, Plaintiff made payment for the Goods on September 9, 2016 in accordance with the instructions given on the seller's invoice.

31.     In reliance upon the aforementioned assurances from STS Ltd., on October 12, 2016, Plaintiff and Transmar entered into two contracts for the sale of the Goods. Under these contracts, Plaintiff agreed to sell to Transmar approximately 1,000 metric tons of cocoa butter and approximately 798.336 metric tons of cocoa powder respectively. In view of the indication from STS Ltd. that the Goods were stored in the above-mentioned warehouses, the contracts between Plaintiff and Transmar provided that the sale was "ex warehouse."

32.     On December 13, 2016, Plaintiff sent an email to STS Ltd. advising that Plaintiff had forwarded by courier one of the three originals of each of the seventeen bills of lading to STS Ltd, in accordance with Peter B. Johnson's email of September 8, 2016.

7

In exchange for tendering the original STS bills of lading, Plaintiff requested that STS Ltd. provide a negotiable warehouse receipt and a delivery order for the Goods which would bring documents of title in line with the physical location of the Goods. Plaintiff also indicated that it would guarantee payment of any outstanding freight charges on the Goods so there would be no delay in their release.

33.     On the same date, December 13, 2016, STS Ltd. sent Transmar a list of the Goods to be released to Plaintiff.  In its email to Transmar, on which Plaintiff was copied, STS Ltd. stated that, "these shipments have been released in good faith from the port and stored in your warehouses on the stock of Swiss Trading Solutions."  This was the first time Plaintiff learned that the Goods had apparently been released to Transmar, despite the fact that Plaintiff was in possession of the originals of the STS bills of lading.  Plaintiff purchased the Goods on the basis that they were under the control of STS Ltd.

34.     On December 14, 2016, STS Ltd sent an email to Transmar advising that it had received one of the three originals of each of the seventeen bills of lading for the "… shipments stored under your name and responsibility." STS Ltd. requested that prior to the release of the Goods to Plaintiff, Transmar pay various invoices issued by STS Ltd. in relation to the shipment of the Goods. Later that same date, STS Ltd. sent another email to Transmar requesting that Transmar send release orders for the Goods.

35.     Despite several further requests, Plaintiff did not receive any confirmation from either STS Ltd. or Transmar that the Goods, or title to the Goods, would be released to Plaintiff in exchange for Plaintiff having forwarded one of the three originals of the seventeen bills of lading to STS Ltd.

8

36.     On December 19, 2016, Plaintiff issued a written demand to STS Ltd. referring to STS Ltd.'s failure to release the Goods in response to Plaintiff's presentation of one of the three originals of each of the seventeen bills of lading, as it gave written confirmation it would do in its email of September 8, 2016.  Plaintiff demanded that STS Ltd. provide it with unencumbered title to the Goods by the close of business on December 21, 2016.  This, however, never occurred.

37.     On December 19, 2016, Plaintiff, also issued two written demands to Transmar, one pertaining to the cocoa butter and the other to the cocoa powder.  In the letters, Plaintiff noted that it had been advised that Transmar had accepted shipments of the Goods covered under the seventeen bills of lading. Plaintiff demanded that Transmar deliver back the Goods and/or deliver back unencumbered title to the Goods, by the close of business on December 21, 2016. This, too, never occurred.

38.     STS Ltd responded the same day, December 19, 2016, by email to Plaintiff claiming that it was acting on behalf of the carrier, STS Care, and that Plaintiff would have to write directly to STS Care.  Attached to STS Ltd.'s email was a letter written by STS Care and addressed "To Whom It May Concern," in which it purported to declare (erroneously) the seventeen bills of lading as "settled and void."

39.     On December 20, 2016, Plaintiff issued a letter to STS Ltd. disputing the allegations contained in STS Care's letter of December 19, 2016. Plaintiff again demanded that STS Ltd. release unencumbered title to the Goods by the close of business on December 21, 2016.

40.     The deadline of December 21, 2016 set in Plaintiff's demand letters passed without any release of the Goods or unencumbered title to Plaintiff.

41.     On December 28, 2016, Plaintiff sent letters to Hall's Warehouse Corporation, Cocoa Services LLC, and Cocoa Services West, LLC, the operators of the four warehouses to which Goods had been delivered.  In each of the letters, Plaintiff requested confirmation that the Goods received by the particular warehouse remained in the warehouse's custody. Plaintiff also requested confirmation of the applicable warehouse receipt numbers. Plaintiff indicated further that in the event the Goods were not made immediately available to Plaintiff, Plaintiff would hold the warehouse company fully responsible.  Halls Warehouse responded that it was not authorized to release the requested information to Plaintiff.  No response was received from either of Transmar's then-subsidiaries, Cocoa Services LLC or Cocoa Services West, LLC.

42.     On December 31, 2016, Transmar filed a voluntary petition for protection under Chapter 11 of the United States Bankruptcy Laws in the United States Bankruptcy Court for the Southern District of New York, Civil Action No. 16-13625.

43.     On April 7, 2017, Plaintiff submitted a Proof of Claim in the Transmar bankruptcy proceeding in support of its claim against Transmar for the loss of the Goods.

44.     On May 23, 2017, the Bankruptcy Court granted a motion to convert the Transmar bankruptcy from a Chapter 11 reorganization to a Chapter 7 liquidation.

45.     On July 14, 2017, Cocoa Services LLC filed a voluntary petition for protection under Chapter 11 of the United States Bankruptcy Laws in the United States Bankruptcy Court for the Southern District of New York, Civil Action No. 17-11936.

10

46.     Despite due demand, Plaintiff has not been provided with title to the Goods, the Goods have not been delivered to Plaintiff, and Plaintiff has not received any payment for the Goods.  As a consequence thereof, Plaintiff has suffered a loss covered under the Policy ("Loss").

## PLAINTIFF'S INSURANCE CLAIM

47.     Plaintiff incorporates the facts and allegations contained in the foregoing paragraphs as though fully set forth herein.

48.     As a result of the Loss, on December 28, 2016, Plaintiff timely issued a notice of potential claim to Defendants.  Based on the information then available, Plaintiff advised Defendants of an apparent loss due to theft of the Goods by Transmar and declared a preliminary date of loss of December 16, 2016.

49.     On December 29, 2016, Plaintiff's notice was posted to the Rekerdres Electronic Cargo Insurance System ("RECIS"), a communications portal and database maintained by the Plaintiff's insurance broker, Rekerdres & Sons Insurance Agency, Inc. ("Rekerdres") and to which each of the Defendants has access.

50.     Defendants responded to the notice of claim by posing numerous questions to Plaintiff regarding the details of the claim, to which Plaintiff responded in a timely manner.

51.     Beginning on January 3, 2017, Plaintiff, through undersigned counsel, provided Defendants with status reports detailing Plaintiff's efforts to obtain information regarding the Loss.

52.     On February 9, 2017, Defendants were provided with a complete copy of the claim filed maintained by Rekerdres.

53.     Information, documents, and assessments continued to be periodically provided to Defendants via the RECIS portal.

54.     On March 13, 2017, Defendants issued a reservation of rights letter in response to Plaintiff's claim.  To Plaintiff's surprise and disappointment, the reservation of rights letter misstated and omitted key facts and misconstrued documents. In some instances, it appeared to Plaintiff that Defendants' description of the facts and documents was intended to cast Plaintiff in a negative light. In addition, many of Defendants' references to the Policy overlooked critical terms and conditions having a direct bearing on Plaintiff's claim.  A primary example of this is the absence of any mention of the Policy's Conclusivity Clause, as discussed below, which has a fundamental bearing on the burden of proof with respect to Plaintiff's claim.

55.     The reservation of rights letter also included a request for ten categories of documents.  Plaintiff produced documents in response to some requests but objected to others on the grounds that the requested documents were not relevant and material to Plaintiff's claim.  Defendants also requested that Plaintiff produce a number of third-party documents which were not within Plaintiff's possession, custody or control.

56.     On May 18, 2017, Plaintiff submitted an application for a "Payment on Account" to Defendants.  Plaintiff's application was made pursuant to a mechanism provided in the Policy by which an initial payment of seventy-five percent of the amount of a claim can be advanced to the insured on a recourse basis.

57.     On May 22, 2017, Plaintiff provided an extensive written response to Defendants' reservation of rights letter.  Along with its response, Plaintiff produced various documents requested by Defendants and objected to certain of the requests on the grounds that they called for the production of documents that were not relevant and material to Plaintiff's claim.

58.     In its response to the reservation of rights letter, Plaintiff also expressed its view that it had submitted sufficient documents and information to support its claim.

59.     On or about May 26, 2017, Defendants rejected Plaintiff's application for a payment on account.

60.     Over the course of the next several months, Plaintiff kept Defendants informed of its sue and labor efforts and provided various additional documents in support of its claim.

61.     On August 4, 2017, Plaintiff wrote to Defendants to, *inter alia*, make the following request:

> *Theobroma specifically requests that Underwriters identify any issues of coverage suggested in the ROR which Underwriters consider at this point to remain unresolved. An indication of Underwriters' present assessment of coverage is essential to Theobroma's preparation of its proof of loss, which is currently underway. The reason it is essential that Theobroma be informed of any coverage issues that Underwriters still consider to be unresolved is because that information will afford Theobroma the opportunity to address, to the extent possible, those very unresolved issues in the proof of loss that Theobroma is preparing.*

62.     Defendants did not comply with this request.

63.     On October 18, 2017, Plaintiff produced to Defendants nearly one thousand pages of documents it had recently obtained from the Trustee, and from the Unsecured

13

Creditors' Committee, in the Transmar bankruptcy.  These documents indicated that a very substantial portion of the Goods had already been resold or were no longer in the possession or control of Transmar, its agents, or STS Ltd.

64.     On October 19, 2017, Plaintiff submitted a highly detailed Proof of Loss in support of its claim for losses stated to be in the amount of $9,904,572.02.  Plaintiff also claimed $92,314.64 in sue and labor expenses, while reserving its right to claim for any additional sue and labor expenses it incurred.

65.     Plaintiff's Proof of Loss was submitted by its broker, Rekerdres, a marine insurance brokerage established in 1953.  The Proof of Loss had been prepared by a licensed adjuster at Rekerdres under the supervision of Mr. Ted Rekerdres, CIC, CRM, who has forty years of experience in the insurance field.

66.     In support of Plaintiff's Proof of Loss, undersigned counsel provided an extensive analysis of three alternative grounds for coverage for the Loss under the Policy, as discussed below.

67.     When no response was forthcoming, Rekerdres, acting on behalf of Plaintiff, wrote to Defendants on November 8, 2017, asserting the provisions of Clause 45 and 46 of the Policy which concern procedures for the handling of claims.

68.     On November 9, 2017, Defendants disputed Plaintiff's invocation of the aforementioned clauses on the basis of an assertion that "documentation for Plaintiff's claim is incomplete."  Defendants also took the position that on the basis of their self-serving position that Plaintiff had not submitted a sufficient claim, they have the

14

unilateral right under Clause 46 to decide when to respond to Plaintiff's request for coverage.

69.     On November 28, 2017, Defendants issued a request for forty-eight categories of documents.  As was the case with Defendant's initial document request accompanying their reservation of rights letter, a substantial number of the document requests concerned matters Plaintiff had indicated it considered not to be relevant and material to its claim. Moreover, as was also the case with Defendants' initial document request, many of the requested documents were third-party documents not within the possession, custody or control of Plaintiff.

70.     Defendants suggested that its requests be included in a set of requests for production of documents directed to STS Ltd. that Plaintiff was seeking authorization from the Transmar bankruptcy court to serve.  As Defendants were well aware, however, many of the documents are not in the possession, custody, or control of Plaintiff, but are instead in the possession of foreign entities that are not parties to the Transmar bankruptcy proceeding.  Defendants offered no explanation, however, as to the basis for their assertion that Plaintiff's claim had not been sufficiently documented.

71.     On December 11, 2017, Plaintiff objected to Defendants' 48-item document request on the grounds that: (a) the bankruptcy court was unlikely to look favorably upon such a wide range of document requests; (b) as Plaintiff indicated in its response to Defendants' earlier document requests, the scope of documents went beyond what was material and relevant to Plaintiff's claim; and (c) to the extent the requested documents were relevant and material, Defendants should have requested them at the time they

issued their reservation of rights letter nine months earlier.   Because of the very considerable delay in requesting the documents, Plaintiff also protested that it was highly unlikely that the Swiss prosecutor (as discussed below) would be willing to issue a supplemental document order to STS Ltd.

72.     Put simply, Plaintiff neither had, nor has, any reasonable means of obtaining these documents, as they fall well outside the scope of the Transmar bankruptcy and the Swiss criminal investigation of STS Ltd.'s managers, even assuming they were all relevant and material.

73.     On the same date, December 11, 2017, Plaintiff also declared Defendants in breach of the Policy due to the substantial delay caused by Defendants' assertion that Plaintiff had not submitted a sufficient Proof of Loss and, further, because of Defendants' refusal to comply with Clauses 45 and 46 of the Policy.

74.     On December 15, 2017, Plaintiff provided a lengthy response to Defendants' document requests of November 28, 2017.

75.     On December 18, 2017, Plaintiff issued an Initial Written Notice in accordance with the dispute resolution procedures provided under Clause 49 of the Policy.   Under these procedures, Defendants were required to submit a written response to Plaintiff's Initial Written Notice.

76.     Defendants provided their response by the agreed date of January 9, 2018. In their response, Defendants, *inter alia*, rejected Plaintiff's declaration of breach. Defendants also stated that they believed "the invocation of Clause 49 is premature and ill conceived."

77.     Defendants also stated that they could not even consider a discussion about the merits of the claim until, at a minimum, Plaintiff provided the documents specified in the first six of Defendants' document requests.   At the same time, Defendants suggested further that until "full documentation" as to the status of the Goods in 2016 was provided, "the claim remains unsubstantiated."

78.     On February 1, 2018, Plaintiff responded to Defendants' communication of January 9, 2018, noting, *inter alia*, that it had responded to Defendants' document requests on December 14, 2017.  Plaintiff also suggested that it was essential that counsel "meet and confer" to address any and all remaining claim submission issues.

79.     Defendants responded the same day by suggesting that Plaintiff's December 14, 2017 response to Defendants' document requests pertained to a previous set of document requests, rather than the set enclosed with Defendants' letter of January 9, 2018.

80.     On February 12, 2018, Plaintiff responded by pointing out that the first six document requests in Defendants' document requests of January 9, 2018 replicated requests included in Defendants' previous requests of November 28, 2017.  As Plaintiff had noted previously, it responded to those requests on December 14, 2017.

81.     Plaintiff also stated the following with respect to Defendants' refusal to take a position on coverage:

> *What makes the situation particularly egregious is the fact that the six document requests -- upon which Underwriters are pinning their refusal to take a position on coverage -- pertain to only 2 of the 17 bills of lading, only 15 of the 75 containers shipped under other of the bills of lading, and warehouse receipts for only two deliveries of containers. Theobroma considers it a willful breach of the*

*contractual duty of good faith for Underwriters to refuse to respond on coverage with respect to the very substantial portion of goods which are not the subject of the six document requests addressed above.* (emphasis in original).

82.     Noting that "it is entirely unacceptable that Underwriters are holding Plaintiff's entire claim hostage for the sake of a relatively small portion of the claim," Plaintiff called upon Defendants to respond, by February 19, 2018, as to whether Defendants: (a) accept coverage for the claim as a whole; (b) accept coverage for the very substantial portion of the claim not implicated by Defendants' six document requests so the parties could then proceed to address the remaining parts of the claim; or (c) advise whether Defendants wished to participate in mediation as a precursor to litigation.

83.     On February 14, 2018, Plaintiff provided Defendants with two spreadsheets referencing by Bates number the documents Plaintiff had submitted in support of its claims.  The spreadsheets, one for the cocoa butter and the other for the cocoa powder, identified the relevant documents at each of the points in time relevant to the claim.

84.     Over the course of the roughly three thousand pages of documents Plaintiff has produced to Defendants at various stages since its initial notice of loss in December 2016, Plaintiff has produced all of the documents required to substantiate its claim under the Policy, including:

> a. Shipment documents from Indonesia, including certificates of origin, intermodal certificates, quality certificates, product content statements, certificates of analyses, and container stuffing reports.
>
> b. The seventeen bills of lading reflecting the Goods, along with very substantial amounts of correspondence and other documentation concerning the purchase, payment, endorsement, and tender of the bills of

18

lading, as well as other documents obtained from STS Ltd. that appear to pertain to the carriage of the Goods.

c.  Documents covering the domestic handling of the Goods through U.S. Customs; to delivery to, and entry into, warehouses, and in some cases, transfer of the Goods to other warehouses. This production includes a series of documents organized by container.

d.  Inventory documents from the new owners of Cocoa Services LLC, as well as nearly a thousand pages of documents obtained from STS in the criminal proceeding initiated by Plaintiff in Switzerland. These latter documents include correspondence and other documents reflecting an apparent scheme between Transmar and STS for release of the Goods without production of the original STS house bills of lading.

85.    On February 16, 2018, Defendants informed Plaintiff that they would respond as to coverage during the week of March 5, 2018.  That same day, Plaintiff replied that the further delay was unacceptable.

86.    In Defendants' reservation of rights letter of March 13, 2017, Defendants stated, "We will keep [Plaintiff] informed regarding the progress of the Defendants' investigation." In its response, Plaintiff stated that it appreciated Defendants' commitment to keep it informed as to the progress of their investigation. Plaintiff also specifically requested that, "… Underwriters keep Plaintiff timely informed of the progress of any further investigation," but at no time whatsoever have Defendants advised Plaintiff of the course of their investigation.

87.    Defendants have repeatedly suggested that Plaintiff has not submitted a sufficient Proof of Loss.  Plaintiff has likewise rejected this position on several occasions. Yet, Defendants persisted in using their assertion as a justification for refusing to honor their obligations under the Policy.

88.     It has consistently been Plaintiff's position that it submitted a sufficiently documented claim at the time it responded to Defendants' reservation of rights letter, but in any event by the time it submitted its Proof of Loss.

89.     In an effort to achieve a resolution of the dispute, Plaintiff called upon Defendants to explain the relevance and materiality of the requested documents to their determination of coverage, particularly given the fact that a substantial number of those documents are outside Plaintiff's possession, custody, or control.

90.     Plaintiff repeatedly suggested that the parties "meet and confer" to discuss the grounds for any supposed insufficiency in Plaintiff's proofs.

91.     On March 9, 2018, Defendants issued a letter denying coverage for Plaintiff's claim, the alleged grounds for which are addressed in the following section.

92.     On April 6, 2018, Plaintiff provided Defendant with a detailed response to each of the assertions made in the denial of coverage, as discussed below, and demanded that Underwriters agree by April 13, 2018 to pay the claim in full.

93.     On April 12, 2018, Defendants rejected Plaintiff's demand that the claim be paid in full, thereby necessitating that Plaintiff commence the instant action.

94.     As a result of Plaintiff's wrongful actions, Plaintiff has been forced to carry a loss of nearly $10 million for nearly a year and a half.

## COVERAGE UNDER THE POLICY

95.     Plaintiff incorporates the facts and allegations contained in the foregoing paragraphs as though fully set forth herein.

20

96.     Regardless of any definitive findings as to the handling and disposition of each container-load of the Goods, the Policy provides coverage for Plaintiff's loss under each eventuality. As explained below, if the Goods were converted by Transmar, and perhaps STS, after Plaintiff purchased the Goods on August 30, 2016, Plaintiff's claim is covered as a theft loss due to conversion. If the Goods were converted prior to August 30, 2016, coverage lies under the Policy's "Lost or Not Lost" terms and/or the Policy's Fraudulent Bills of Lading Clause.

97.     If the Goods were converted by Transmar, and/or perhaps STS, after Plaintiff purchased the Goods on August 30, 2016, Plaintiff's claim is covered as a theft loss due to conversion under the following terms.

> ### 19. POLICY SPECIFIC – CONDITIONS, CLAUSES, TERMS, AND DEFINITIONS
>
> *Policy Specific – Conditions, Clauses, Terms and Definitions Clauses: the following conditions, clauses, terms and definitions specific to this Policy are included: …*
>
> *Theft Loss Occurrence Clause: claims arising from the perils of theft are deemed to include acts committed or organized by a single perpetrator or group of perpetrators and/or resulting from the same originating cause regardless of the period of time so embraced. Except as otherwise provided, no loss occurrence shall be deemed to commence earlier than the date and time of the happening of the first recorded individual loss to the Policyholder in that occurrence during the period of this Policy.*

98.     Plaintiff's ownership interest in the Goods derives from its purchase of the Goods from Amerra and its sale of the Goods to Transmar pursuant to terms by which title to the Goods was retained by Plaintiff until Transmar paid for the Goods, which it did not do. Plaintiff's right to possession of the Goods is demonstrated by the fact that on

December 13, 2016, it surrendered one original of each of the seventeen STS bills of lading without being given warehouse receipts in return. As a result, Plaintiff was entitled to, and did, demand the return of the Goods, to no avail.

## Claim For Coverage Under Theft Loss Terms

99.     In their denial of coverage letter, Defendants contend, *inter alia,* that Plaintiff's claim is not insured as a theft loss because Plaintiff allegedly did not acquire title to or a right to possess the cocoa products.  Defendants base this contention primarily upon two arguments:

100.    First, Defendants suggest, without reference to any legal authority, that the STS bills of lading were "spent" (i.e., fully performed) at the time Theobroma purchased the Goods and therefore could not operate as documents of title.

101.    In its letter of April 9, 2018, Plaintiff explained that under Swiss law, which governs the STS bills of lading, the bills of lading were not "spent" because the Goods were delivered without production of the originals of the STS bills of lading.

102.    Second, Defendant assert, again without reference to any legal authority, that because Amerra, the party that sold the Goods to Plaintiff, did not have good title to the Goods, it could not convey good title to Theobroma.

103.    In its letter of April 9, 2018, Plaintiff explained that under English law, Theobroma obtained good title.

## Alternative Claim Under "Lost or Not Lost" Terms

104.    If, alternatively, the Goods were converted prior to August 30, 2016, coverage lies under the "Lost or Not Lost" terms in Clause 7 of the Policy:

**ATTACHMENT OF RISKS**

*Attachment of Risks Clause: this Policy insures all such Cover Interest purchased by the Policyholder or for their account or stored on their premises while the Cover Interest is in process of and/or waiting shipment in warehouses, facilities compresses, yards and/or on wharves, levees or (re)bagged in silos, compartments, beneficios or elsewhere in the World – attaching from the moment the Cover Interest becomes the property of the Policyholder or legally at their risk or at which the Policyholder assume a financial interest in the Cover Interest – or for which the Policyholder deem themselves responsible by contract, custom, pre-finance or joint marketing agreements, and whether or not a warehouse receipt or other title document has been or will be issued, but in no event to attach on Cover Interest yet to be separated from the plant …*

*iii. Attaching on all Cover Interest subject to Shipment Terms – Rating from the moment of shipment, sale, or purchase; and whether Lost or Not Lost …*

105.    Further provisions dealing with "lost or not lost" coverage are found in Clause 19:

**POLICY SPECIFIC – CONDITIONS, CLAUSES, TERMS, AND DEFINITIONS**

*Policy Specific – Conditions, Clauses, Terms and Definitions Clauses: the following conditions, clauses, terms and definitions specific to this Policy are included: …*

*Lost or Not Lost – means that notwithstanding the need of an insurable interest at the time of loss, the Policyholder's insurable interest may attach after loss, provided neither the Policyholder nor Underwriters had prior awareness of the loss.*

106.    Coverage on a "lost or not lost" basis was addressed by the United States Supreme Court in *Hooper v. Robinson*, 98 U.S. 528, 537 (1789): "Where the insurance is "lost or not lost," the thing insured may be irrecoverably lost when the contract is entered into,

and yet the contract be valid. It is a stipulation for indemnity against past as well as future losses, and the law upholds it."

107.    Thus, to the extent any portion of the Goods was lost prior to August 30, 2016, the date on which Plaintiff obtained an insurable interest in the Goods, such loss is covered under the Policy's "Lost or Not Lost" terms.

108.    In their denial of coverage letter, Defendants contend that to the extent Plaintiff contends that the cocoa products did not exist, the Plaintiff, in the alternative, may not claim coverage pursuant to the "Lost or Not Lost" provision.  Defendants then suggest that because Plaintiff allegedly was aware that the Goods had been delivered prior to Theobroma's purchase of the Goods, Plaintiff cannot claim that the cocoa products had been stolen prior to August 30, 2016 (the date of Theobroma's purchase of the Goods).

109.    In its response, Plaintiff pointed out that it is not contending that the cocoa products did not exist, that the issue of what Plaintiff should have known is irrelevant, and that because of these two defects, Defendants are in error in asserting that Plaintiff cannot assert a claim under the Policy's "Lost or Not Lost" terms.

## Alternative Claim Under Fraudulent Bill of Lading Clause

110.    In addition, or in the alternative, to coverage under the Policy's Lost or Not Lost Terms, if the Goods were converted prior to August 30, 2016, coverage lies under the Policy's Fraudulent Bills of Lading Clause.

### *LOSS AND/OR THEFT OF DOCUMENTS AND/OR COVER INTEREST*

> *Loss and/or Theft of Documents Clause: It is hereby agreed that in respect of the Policyholder's sales and purchases covered hereby on full terms or on a contingency basis this Policy includes the loss of and/or theft of Cover Interest arising from theft of documents of title (meaning to include electronic warehouse receipts) or fraudulent shipping documents including physical loss or damage to the Policyholder's Cover Interest by reason of the actions of third party(ies) in obtaining possession of the Cover Interest whilst in Policyholder's possession, control or otherwise. It is also agreed to include legitimate documents of title without the authorization or consent of the Policyholder and/or their agents …*

> *Wrongful Possession of Cover Interest Clause: It is agreed that in the event of physical loss and/or damage to Cover Interest described in the Loss and/or Theft of Documents Clause, coverage shall apply hereon notwithstanding that during any period that the Cover Interest were in the wrongful possession of third party(ies) or Policy terms or conditions may not have been complied with.*

111.    On information and belief, at the time Transmar endorsed the STS house bills of lading, it knew that all of the Goods had been improperly released to it and, further, that some or all of the Goods had been disposed of, and thus lost. Consequently, Transmar's endorsement of the STS house bills of lading rendered those bills of lading fraudulent.

112.    There is also information suggesting that notwithstanding STS's knowledge that it had issued house bills of lading, STS nonetheless released other documents to Transmar, which Transmar used to improperly obtain release of the Goods upon discharge.  If that is indeed the case, then the STS house bills of lading became fraudulent when STS Ltd. released the Goods to Transmar despite Transmar's inability to produce the originals of the STS house bills of lading.

113.     Under either set of circumstances, coverage in favor of Plaintiff is triggered under Clause 37, which provides coverage for, *inter alia*, "the loss of and/or theft of Goods arising from ... fraudulent shipping documents ... by reason of the actions of third party(ies) in obtaining possession of the Cover Interest ... or otherwise."

114.     In its denial of coverage letter, Defendants contend that there is no coverage under the Policy's Fraudulent Bills of Lading clause because Plaintiff must have sustained a physical loss of the Goods, the STS bills of lading were neither stolen or forged and, further, the Goods referenced in the STS bills of lading were delivered as described therein.

115.     In its response, Plaintiff pointed out that the wording of the Fraudulent Bills of Lading Clause does not require physical loss.  Plaintiff also responded that the scope of coverage under the clause includes losses resulting from "fraudulent shipping documents" and that it is not limited to bills of lading that are stolen or forged.  Lastly as noted above in the context of whether the STS bills of lading were "spent," Plaintiff disputes Defendants contention that the Goods were delivered as described in the STS bills of lading.

<u>Conclusivity Clause</u>

116.     On the basis of all of the information and documents submitted to date, including specifically warehouse receipts for all but two of the shipments as evidence of "entry into storage" of the Goods, Plaintiff is entitled to invoke the Conclusivity Clause found in Section 19, Policy Specific – Conditions, Clauses, Terms, and Definitions, which provides as follows:

26

*Conclusivity Clause: the documents issued by the custodian evidencing shipment of covered interest or entry into storage shall be conclusive. The burden of disproof is upon Underwriters in any dispute as to the existence of quantity and quality of insured goods being entered in sound condition; it being understood and agreed that the foregoing coverage is granted on the condition that the Policyholder shall not be relieved (unless at terms and conditions to be agreed) of the obligation to purchase, store and/or ship Cover Interest in sound condition.*

117.    Because Theobroma has satisfied its obligations under the Conclusivity Clause, it is Defendants' burden to disprove the existence of, quantity, and quality of the insured Goods being entered into storage in sound condition.

## PLAINTIFF'S SUE AND LABOR EFFORTS

118.    Plaintiff incorporates the facts and allegations contained in the foregoing paragraphs as though fully set forth herein.

119.    Until such time that Defendants agree to coverage for the Loss, Plaintiff is legally obligated to act as a prudent uninsured in taking reasonable action ("sue and labor") to avoid further loss of the Goods and to preserve and/or pursue claims against third parties for the loss of the Goods.

120.    The obligation to sue and labor is also set out in the Policy as follows:

*DUTY OF POLICYHOLDER CLAUSE:*

*It is the duty of the Policyholder and its servants and agents in respect of loss recoverable hereunder*

*1.   to take such measures as may be reasonable for the purpose of averting or minimizing such loss, and*

*2.   to ensure that all rights against carriers, bailees or other third parties are properly preserved and exercised and the Underwriters will, in addition to any loss recoverable hereunder, reimburse the*

*Policyholder for any charges properly and reasonably incurred in pursuance of these duties.*

121.    The Policy also provides as follows in subparagraph iii of Clause 14:

*DUTY OF POLICYHOLDER CLAUSE:*

*It is the duty of the Policyholder and its servants and agents in respect of loss recoverable hereunder to take such measures as may be reasonable for the purpose of averting or minimizing such loss, and to ensure that all rights against carriers, bailees or other third parties are properly preserved and exercised and the Underwriters will, in addition to any loss recoverable hereunder, reimburse the Policyholder for any charges properly and reasonably incurred in pursuance of these duties.*

122.    In order to discharge its obligation to sue and labor in respect of the Goods and to protect Underwriters' subrogation rights by pursuing claims against third parties, Plaintiff retained undersigned counsel to act as its lead counsel.  Plaintiff also retained Platzer, Swergold, Levine, Goldberg, Katz & Jaslow, LLP, to act as its bankruptcy counsel in connection with the Transmar bankruptcy proceeding.

123.    On February 6, 2017, undersigned counsel wrote to Riker Danzig Schere Hyland & Perretti LLP, lead counsel for Transmar, requesting information and documents concerning the then-current location and condition of the Goods. No information or documents were provided in response to this request.

124.    On March 2, 2017, undersigned counsel wrote to Profreight, Inc. ("Profreight") of Edison, New Jersey, which had been listed as the second notify party on the STS bills of lading, to request information and documents concerning the Goods.  On the basis if this designation, Plaintiff believed that Profreight had arranged and/or

28

effected delivery of the Goods - following discharge of the various shipments at the Port of New York/New Jersey and the Port of Oakland, California - to the respective warehouses identified above.  Profreight conditioned its willingness to respond to Plaintiff's request for information and documents upon a waiver by Plaintiff of any claims against it.  Under the circumstances, Plaintiff rejected this condition.

125.    On July 5, 2017, Plaintiff filed a motion pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure seeking authorization to issue subpoenas for the production of documents to Transmar, STS Ltd., Profreight, and the aforementioned warehouses, and for leave to take the oral examination of each of those parties.

126.    On July 27, 2017, the Court in the Transmar bankruptcy proceeding granted Plaintiff's motion for discovery as to Transmar, but deferred decision on Plaintiff's request for discovery from the remaining parties pending the outcome of Transmar's discovery responses.  The hearing on the deferred portion of Plaintiff's motion was originally scheduled for November 4, 2017 but was thereafter adjourned several times on the Court's initiative until March 13, 2018.  At the hearing, the Court denied Plaintiff's motion on the grounds that the documents sought went beyond the scope of the Plaintiff's Proof of Claim in the bankruptcy proceeding.

127.    Prior to the Court's initial ruling, Plaintiff had not able to obtain documents or information from the Unsecured Creditors' Committee because in order to do so, it would have been required to execute a Confidentiality Agreement which would have foreclosed Plaintiff's ability to use any information or documents it obtained in connection with its claim in the Transmar bankruptcy proceeding and also prohibited

29

Plaintiff from using any information or documents it obtained in connection with its insurance claim.

128.    Once the Transmar bankruptcy was converted to a Chapter 7 proceeding, counsel for the Trustee agreed to release Plaintiff from any obligations with respect to the Confidentiality Agreement.   This enabled Plaintiff to obtain a substantial volume of documents from the Unsecured Creditors' Committee.

129.    In early October 2017, following discussion and correspondence with counsel for the Trustee, the Trustee provided Plaintiff with a very substantial volume of documents from Transmar's books and records. These documents covered the discharge of the various shipments of the Goods, clearance of the Goods through U.S. Customs, delivery of the Goods to the respective warehouses, and acceptance of the Goods into storage at the warehouses.  The documents also indicated that Transmar had wrongfully used or resold a very substantial portion of the Goods.

130.    Plaintiff has also submitted various pleadings, and engaged in correspondence and discussions, in connection with various other issues that have arisen in the Transmar bankruptcy proceeding.

131.    In further discharge of its duty to sue and labor and in order to protect Underwriters' subrogation rights by pursuing claims against third parties, Plaintiff retained Olivier Nicod, Esq. of Gross & Associés as lead counsel, Stephane Konkoly, Esq, of burchardt Ltd. as local counsel, and Carlo Bertossa, Esq. of Borer Bertossa Advokaten as criminal counsel, to pursue claims against STS Ltd. and STS Care in Switzerland.

132.    On January 5, 2017, Plaintiff issued an Order to Pay to STS Ltd., demanding that it indemnify Plaintiff for the loss of the Goods.  STS Ltd. did not respond to the demand.

133.    On January 23, 2017, Plaintiff filed a criminal complaint against STS Ltd. with the Staatsanwaltschaft (prosecutor's office) for Basel Landschaft.  In connection with its complaint, Plaintiff provided extensive information and documents to the prosecutor.

134.    On June 26, 2017, the prosecutor issued a notice to STS advising that it was convening an investigative hearing to be held on August 17, 2017, and directing Mr. Pasquale Genier, CEO of STS Ltd., to appear and give testimony and to produce documents.

135.    At the hearing on August 17, 2017, M. Genier appeared at the hearing but refused to give any testimony on the advice of counsel. He was also given additional time to produce the requested documents. Following the hearing, Swiss counsel for Plaintiff provided information to the prosecutor regarding the details of customary shipping documents in order to assist his further inquiry into STS.

136.    Following the hearing, STS Ltd. produced documents to the prosecutor which were then made available to Plaintiff.  These documents contained additional information regarding the handling of the Goods following discharge in the United States and certain agreements and practices between Transmar and STS Ltd. concerning the release of shipments, including the shipments of the Goods.

137.    It is Plaintiff's understanding that the criminal investigation of STS Ltd. is ongoing.

138.    In further discharge of its duty to sue and labor and in order to protect Underwriters' subrogation rights by pursuing claims against third parties, in connection with its civil claims against STS Ltd. and STS Care, Plaintiff requested that the two parties sign tolling agreements with respect to any statutes of limitations applicable to Plaintiff's claims.  On December 1, 2017, STS Ltd. executed a tolling agreement in favor of Plaintiff. Because STS Care was not willing to execute a tolling agreement on the terms required by Plaintiff, on December 12, 2017, Plaintiff filed a Request for Conciliation (the equivalent of a civil complaint) against STS Care, as well as Cargo & Logistics Management, Sdn BhD. of Malaysia which signed the bills of lading on behalf of STS Care.

**AS AND FOR A FIRST CAUSE OF ACTION**
**<u>(INDEMNITY UNDER INSURANCE POLICY)</u>**

139.    Plaintiff incorporates the facts and allegations contained in the foregoing paragraphs as though fully set forth herein.

140.    The Policy provides Plaintiff with coverage for the losses which are at issue in this case.

141.    The Policy was in force and effect at the time of Plaintiff's losses.

142.    Plaintiff has paid all premiums due, performed all of its obligations under the Policy, and acted as a prudent uninsured in investigating the circumstances of the loss and preserving Underwriters' subrogation rights by pursuing claims against various third-party claims relating to the loss.

143.    Under the terms of the Policy, Defendants are obligated to reimburse Plaintiff for its losses as a result of the loss detailed above.

144.    Despite due demand, Defendants have failed to pay Plaintiff the full insurance proceeds to which it is entitled.

145.    As of the date of the filing of this Verified Complaint, no part of the outstanding amount due to Plaintiff has been paid.

146.    The non-payment of Plaintiff's claim for the Loss constitutes a breach of the terms and conditions of the Policy for which Defendants are liable.

147.    Solely as a result of Defendants' failure and refusal to pay Plaintiff the amounts to which it is entitled under the Policy, Plaintiff has suffered loss and damage in an amount to be established at trial, but presently estimated to be in excess of $9,904,572.02, together with consequential and incidental damages, interest, legal fees, disbursements, and other expenses Plaintiff has been forced to incur as a result of Defendants' refusal to accept coverage for the Loss.

## AS AND FOR A SECOND CAUSE OF ACTION
## (REIMBURSEMENT OF SUE & LABOR EXPENSES)

148.    Plaintiff incorporates the facts and allegations contained in the foregoing paragraphs as though fully set forth herein.

149.    The Policy provides coverage for the expenses incurred Plaintiff in engaging in sue and labor efforts and for preserving Underwriters' subrogation rights by pursuing claims against third parties.

150.    The Policy was in force and effect at the time Plaintiff incurred the aforementioned expenses.

151.    Plaintiff has paid all premiums due, performed all of its obligations under the Policy, and acted as a prudent uninsured in investigating the circumstances of the loss and preserving and pursuing various third-party claims relating to the loss.

152.    Under the terms of the Policy, Defendants are obligated to reimburse Plaintiff for its expenses in discharging the duties imposed upon it as a result of the loss.

153.    Despite due demand, Defendants have failed to pay Plaintiff the amounts to which Plaintiff is entitled under the Policy.

154.    As of the date of the filing of this Verified Complaint, no part of the outstanding amount due to Plaintiff has been paid.

155.    The non-payment of Plaintiff's claim for expenses it incurred constitutes a breach of the terms and conditions of the Policy for which Defendants are liable.

156.    Solely as a result of Defendants' failure and refusal to pay Plaintiff the amounts to which it is entitled under the Policy, Plaintiff has incurred, and continues to incur, expenses in discharging the obligations imposed upon it by the Policy in the event of loss, in an amount to be determined at trial, but presently estimated to be in excess of $250,000.00.

WHEREFORE, Plaintiff seeks judgment against Defendant as follows:

a.    Finding Defendants in breach of the Policy and therefore responsible in their respective underwriting interests to Plaintiff;

b.    Awarding Plaintiff the insured losses it has incurred in an amount to be determined at trial, but presently estimated to be in excess of $9,904,572.02, together with consequential and incidental damages and other expenses Plaintiff

has been forced to incur as a result of Defendants' refusal to accept coverage for the Loss.

       c.    Awarding Plaintiff the expenses it has incurred, continues to incur, and will incur, in discharging the sue and labor obligations imposed upon it by the Policy in the event of loss, in an amount to be determined at trial, but presently estimated to be in in excess of $250,000.00, together with consequential and incidental damages and other expenses Plaintiff has been forced to incur as a result of Defendants' refusal to accept coverage for the Loss.

       d.    Awarding Plaintiff prejudgment interest on the aforesaid amounts, together with attorney's fees and costs, and such other and further relief as the Court may deem just and proper.

Dated:  April 24, 2018           Respectfully submitted,

                               LAW OFFICES OF SIMON HARTER, ESQ.
                               Attorneys for Plaintiff, Theobroma BV

                 By:    /s/  Simon Harter
                       Simon Harter (SH-8540)
                       225 West 34th Street – 9th Floor
                       New York, New York 10122
                       Tel:  (212) 979-0250
                       Fax: (212) 979-0251
                       Email:  sharter@harterlaw.com

## VERIFICATION

I, Simon Harter, hereby affirm as follows:

1.      I am a member of the Bar of this Honorable Court and represent the Plaintiff, Theobroma BV, in this action.

2.      The information in the foregoing Verified Complaint is true to the best of my knowledge, information, and belief, except to those matters therein stated to be alleged upon information and belief.  As to those matters, I believe them to be true.

3.      The sources of my knowledge, information, and belief are documents provided by my client and my discussions and other communications with them.

4.      As Plaintiff is a foreign business entity and none of its officers are located in the Southern District of New York, this verification is made by me as counsel.

I hereby affirm that the foregoing statements are true and correct.

Dated:      New York, New York
            April 24, 2018


                                    /s/ Simon Harter_____